E. MARTIN ESTRADA
United States Attorney
CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division
KATHRYNNE SEIDEN (Cal. Bar No. 310902)
FRANCES S. LEWIS (Cal. Bar No. 291005)
Assistant United States Attorneys
Terrorism and Export Crimes and
Public Corruption and Civil Rights Sections
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0631/4850
    Facsimile: (213) 894-0141
    E-mail:    kathrynne.seiden@usdoj.gov
               frances.lewis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>                 v.<br><br>JAIME TRAN,<br><br>            Defendant. | No. CR 23-98-GW<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT JAIME TRAN<br><br>Hearing Date: August 5, 2024<br>Hearing Time: 8:00 a.m.<br>Location:      Courtroom of the<br>                    Hon. George Wu |

        Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Kathrynne Seiden and

Frances S. Lewis, hereby files its Sentencing Position for Defendant

Jaime Tran.

//

//

This sentencing position is based upon the attached memorandum of points and authorities, the declaration of Kathrynne Seiden attached hereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: July 30, 2024            Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division


_____/s/_____
KATHRYNNE SEIDEN
FRANCES S. LEWIS
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**Table of Contents**

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION................................................1

II.   STATEMENT OF FACTS..........................................2

      A.    Defendant Has a Long History of Making Antisemitic
            Threats...............................................2

            1.    Defendant Engaged in Threatening Conduct and Made
                  Racist Remarks Toward Jewish Classmates..............2

            2.    Defendant Was Arrested With a Firearm................5

            3.    Defendant Made Repeated Violent Threats to a
                  Former Classmate....................................6

      B.    Defendant Prepared to and Attempted to Kill Two Jewish
            Men...................................................9

            1.    Defendant Traveled to Phoenix the Month Before
                  the Shooting to Straw Purchase Two Firearms.........9

            2.    Defendant Shot Victim 1 as He Left Religious
                  Services...........................................10

            3.    The Following Day, Defendant Shot Victim 2 as He
                  Left Religious Services............................11

      C.    Defendant Was Arrested After Firing his Firearms in
            Public...............................................12

      D.    Defendant's Digital Devices Revealed Further Evidence
            of His Hatred........................................13

III.  GUIDELINES AND PROBATION RECOMMENDATION....................15

      A.    Sentencing Guidelines................................15

      B.    Probation's Recommendation...........................19

IV.   A 40-YEAR SENTENCE IS NECESSARY TO ACCOMPLISH THE PURPOSES
      OF 18 U.S.C. § 3553(A)....................................19

      A.    The Nature and Circumstances of the Offenses.........20

      B.    Defendant's History and Characteristics..............22

      C.    The Need for Deterrence, to Protect the Public, and to
            Provide Just Punishment for the Offense..............23

V.    A FIVE-YEAR TERM OF SUPERVISED RELEASE IS WARRANTED........25

VI.   THE GOVERNMENT REQUESTS THAT THE COURT SET A RESTITUTION
      HEARING...............................................................25

VII.  CONCLUSION...............................................................25

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Executing on his sinister plan to "kill all jews," defendant Jaime Tran attempted to murder two strangers leaving religious services on consecutive days in 2023, terrorizing a community and forever altering the lives of his victims and their families. Following a years-long campaign of stalking and threatening Jewish classmates and acquaintances, defendant targeted his victims based on nothing but his perception of their race and religion.  And but for the swift action of law enforcement, defendant would have continued his hate-fueled rampage and likely killed other innocent civilians.

For defendant's abhorrent crimes, a federal grand jury returned an indictment charging him with two hate crimes, in violation of 18 U.S.C. §§ 249(a)(1)(A), (B)(ii), and two counts of discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  (Dkts. 52, 54.)  Defendant pled guilty to those crimes pursuant to a Rule 11(c)(1)(C) agreement, which, once accepted, requires the Court to impose a sentence of imprisonment between 35 and 40 years.  For the reasons stated herein, a 40-year sentence is imperative.

Defendant's conduct was not an isolated bout of mental illness, but a premeditated plan following years of vile antisemitic rhetoric and escalating threats.  His preparation included researching Jewish communities and the deliberate out-of-state straw purchase of firearms in cash to avoid detection by law enforcement.  Defendant is a self-described "ticking time bomb" whose racism and hate will explode upon other innocent communities absent a significant custodial sentence.  Accordingly, a sentence of 480 months'

imprisonment -- the maximum permitted by the plea agreement -- is necessary to protect the public, ensure deterrence, and send a powerful message to would-be copycats that attempted murder borne of prejudice will not stand.

## II.  STATEMENT OF FACTS

### A.  Defendant Has a Long History of Making Antisemitic Threats

#### 1.  Defendant Engaged in Threatening Conduct and Made Racist Remarks Toward Jewish Classmates

For many years now, defendant has espoused his antisemitic beliefs and made violent threats towards individuals who actually were, and whom defendant perceived to be, Jewish.  (Dkt. 52 (Plea Agreement) ¶ 16; Presentence Investigation Report ("PSR") ¶ 18.)  At points, defendant used Instagram and Twitter accounts with the handles "@k1llalljews."  (PSR at 3.)

In 2018, defendant began to complain to his parents that a Jewish classmate in his graduate program had bullied him and stated that he hated the student.  (PSR ¶ 92.)  In February, defendant was reported to school security for yelling on the phone and throwing a chair on its side.  (Declaration of Kathrynne Seiden ("Seiden Decl."), Ex. 1.)  That same month, defendant told a school crisis counselor, whom he had called several times, that Persians are "an evil race" and "God shouldn't have made them."  (Seiden Decl., Ex. 2 at USAO_00000274.)  The school's police department performed a welfare check, during which defendant said he had no intention of harming anyone.  (Id.)  However, defendant admitted he wanted to hurt the females in his class he believed to be bullying him.  (Id.)  The classmates he accused of bullying him were later interviewed and all reported having little to no contact with defendant.  (Id.)

2

In April 2018, two of defendant's classmates reported defendant for additional concerning behavior, including staring at other students, sometimes pushing and touching other students, and making threatening, racist comments on Snapchat.  (Id. at USAO_00000276.)  Both students expressed fear that defendant would be "the next active shooter."  (Id.)  In the course of investigating the reports, the school's police department reviewed screen shots of defendant's Snapchat, including one that said "Fucking little Jew boy.  Fucking little white bitch.  Fucking little immigrant jap backstab bitch.  They gon take me back to my old ways."  (PSR ¶ 18; Seiden Decl., Ex. 2 at USAO_00000278; Ex. 3.)  In another series of screen shots of text messages from defendant, he listed his grievances against named students in his class.  (Seiden Decl., Ex. 2 at USAO_00000278.)  In yet another, he described himself as a "ticking time bomb."  (Id.)

Later in April, three more students came to the school's police department to express similar concerns about defendant.  (Id.)  The students said earlier that day, defendant had gotten up during class, walked out a side door, and then reentered the room from a back door, walking slowly to the front of the class.  (Id.)  The students felt he was practicing for a school shooting and some students left class because they were so concerned.  (Id.)  The school's police department learned that multiple students had complained about defendant's "escalating" behavior, including posting racist comments online and bumping into and pushing other students.  (Id. at USAO_00000279.)  Defendant told the campus officials who had been trying to work with him that he was no longer interested in attending therapy sessions.  (Id.)

1    Based on the foregoing, in April 2018, the campus police
2 assessed defendant to be a danger to himself and others and took him
3 to a hospital where he was involuntarily detained for 72 hours
4 pursuant to California Welfare and Institutions Code § 5150, which
5 prohibited him from possessing firearms for a five-year period.  (PSR
6 ¶ 94; Seiden Decl., Ex. 4 at USAO_00000007; Ex. 2 at USAO_00000280.)
7 Commenting on his situation, defendant said, "I don't know why I'm
8 here.  I guess I made some inappropriate comments on social media.
9 Racial slurs."  (Seiden Decl., Ex. 5 at USAO_00016405.)  However,
10 defendant also claimed to be victimized by his classmates, insisted
11 that he did not need treatment, claimed his classmates were jealous
12 of him, and noted that the school should be protective of him as a
13 "top student."  (Id. at USAO_00016412.)

14    Defendant's involuntary stay at the hospital continued through
15 early May 2018 because defendant was assessed again as a danger.
16 Defendant was therefore held for two additional weeks under
17 California Welfare and Institutions Code § 5250, which banned him
18 from firearm possession for life.  (PSR ¶ 94; Seiden Decl., Ex. 4 at
19 USAO_00000006.)  Defendant then took a medical leave of absence from
20 the school, from which he did not return.  (PSR ¶ 95.)  Even after
21 being advised not to contact other students, defendant continued to
22 do so.  (Seiden Decl., Ex. 6.)

23    In August 2019, defendant was once again assessed to be a danger
24 to himself and others and was placed on another 72-hour detention
25 under California Welfare and Institutions Code § 5150.  (PSR ¶ 97;
26 Seiden Decl., Ex. 4 at USAO_00000005.)  Defendant refused compliance
27 with medication, continued to blame others for lying about him, and
28 was then detained again under California Welfare and Institutions

Code § 5250.   (Id.; PSR ¶ 97.)   At the end of 2019, defendant declined to continue mental health treatment and would lash out at his family when they asked whether he was taking his medication, sometimes punching the walls in his room.   (PSR ¶ 99.)   Defendant stopped coming home altogether around December 2021.   (Id.)

In February 2022, defendant emailed his former school seeking to be refunded his tuition from the time he was enrolled in school. (PSR ¶ 100.)   When told that he had already been refunded part of his tuition and would not be receiving any additional refund, defendant complained that he had to take years of prerequisite courses, attend hours of volunteer services, study and submit fees related to admissions exams, and "pay ridiculously high tuition fees," and thus "wasted years of [his] life . . . just to get harassed by some Persian students[.]"   (Id.)

2.   Defendant Was Arrested With a Firearm

In May 2022, defendant posted a picture of a gun on Instagram:



(Seiden Decl., Ex. 7 at USAO_00000170.)

Shortly thereafter, in July 2022, defendant was arrested by a different university police department for possessing a loaded firearm on the university's campus.  (PSR ¶ 101.)  Specifically, defendant was sitting on campus holding a semiautomatic handgun with a high-capacity magazine loaded with nine bullets.  (Seiden Decl., Ex. 8 at USAO_00000455.)  Defendant told campus police that he was carrying the gun to protect himself and to "hurt some animals."  (Id. at USAO_00000454; PSR ¶ 101.)  He also said that he had purchased the gun in Texas for around $600 or $700 because it was easier to buy the gun in Texas.  (Id.)  About a week later, at defendant's request, defendant's mother bailed him out of jail.  (PSR ¶ 101.)  He left home again soon afterwards.  (Id.)  Defendant's family did not hear from him again until several weeks before the shooting, when he contacted his family to get a spare key for his car, came to pick it up, and left again.  (Id.)

Defendant was arrested again in December 2022 in Taylor, Michigan for a traffic offense under Michigan State Code § 5400 (Hit and Run).  (PSR ¶ 81.)

### 3. Defendant Made Repeated Violent Threats to a Former Classmate

Between August 2022 and December 2022, defendant's antisemitic and violent statements escalated.  For example, beginning around August 2022, defendant repeatedly called and texted a former classmate with a cascade of hateful vitriol.  Those messages included:

- "Fucking Jew. Piece of shit Jew. FUCK YOU JEW.  JEWBAG JEWBAGEL JEW."
- "FUCK YOU PIECE OF LITERAL FUCKING SHIT JEW.  YOU FUCKING DIPSHIT.  I HATE YOU LIKE FUCKING CRAZY YOU FUCKING STUPID

PATHETIC LOSER SUBHUMAN TRASH UGLY DISGUSTING WORTHLESS SENSELESS JEW."

- "Someone is going to kill you, Jew.  Someone is going to kill you, Jew.  Someone is going to kill you, Jew.  Someone is going to kill you, Jew."

- "FUCK YOU JEW.  Just kill yourself tonight you fucking Jew.  I want you dead, Jew.  Someone is going to kill you, Jew."

- "Kill yourself now you Jew."

- "Cut off your dick and bleed to death you fucking Jew."

- "Fuck you, you fucking retarded faggot Jew."

- "Fucking bitch Jew.  Your mom is a slutty whore, your sister is a man, and your dad sucks dicks for a living.  Burn in an oven chamber you bitch Jew. [Photo of gas chambers]."

- "Straight up fucking kill yourself you fucking faggot."

- "Fucking faggot Jew that sucks dick for a living.  You're literally worthless."

(Plea Agreement ¶ 16; PSR ¶ 19; Seiden Decl., Ex. 7 at USAO_00000171-174.)



1    On or around November 25, 2022, defendant emailed approximately

2  two dozen of his former classmates claiming "[t]hat Persian/Iranian

3  Jew of the Class of 2020 got his people to make up a fake, bs disease

4  (COVID) and based it on the anesthesia incident that I had with [two

5  students]."  He attached a flyer containing antisemitic propaganda

6  including the statement: "EVERY SINGLE ASPECT OF THE COVID AGENDA IS

7  JEWISH."  (Plea Agreement ¶ 16; PSR ¶ 20; Seiden Decl., Ex. 7 at

8  USAO_00000180-81.)  The flyer

9  listed various officials

10 associated with the Center for

11 Disease Control (CDC), scientists

12 with Pfizer and Moderna (the

13 companies responsible for the

14 then-existing Covid vaccines), and

15 executives at various investment

16 firms, designating each one of

17 them as "JEWISH."  (Id.)[1]



18   Around the same time, defendant emailed dozens of his former

19 classmates excerpts from a website describing "Persian Jews" as

20 "primitive," "narrow minded," and having "thick skulls."  (Plea

21 Agreement ¶ 16; PSR ¶ 21.)

22   As a result of this conduct, in November 2022, police conducted

23 a welfare check at the home of defendant's parents.  (PSR ¶ 102.)

24 Police learned that defendant had not resided at the home in a year,

25

26   [1] Approximately five months earlier, copies of the same flyer,
   which was associated with the Goyim Defense League, a network of
27 antisemitic provocateurs, had been distributed to various homes in
   Beverly Hills and Westwood near the campus of defendant's school.
28 (See https://beverlyhillscourier.com/2022/04/23/antisemitic-flyers-
   found-on-first-night-of-passover/ (last accessed June 19, 2024).)

had not contacted his family in six months, and had not taken his medication when he was living at home.  (Id.)

**B.   Defendant Prepared to and Attempted to Kill Two Jewish Men**

    1.   Defendant Traveled to Phoenix the Month Before the Shooting to Straw Purchase Two Firearms

As a result of his previous mental health holds, as of 2023, defendant was prohibited from purchasing or possessing firearms. (Plea Agreement ¶ 16; PSR ¶¶ 22-23, 103.)  Knowing that he would not easily be able to obtain a gun in California, defendant went to Phoenix, Arizona for help acquiring the weapons he needed to carry out his plans to eradicate Jewish people.  In January 2023, defendant asked Eric Celaya, someone he met through a moving job on Craiglist, to buy two firearms for him.  (Plea Agreement ¶ 16; PSR ¶ 23; see also United States v. Eric Celaya, 2:23-CR-01456 (D. Ariz.), Dkt. 1 (Indictment); Dkt. 12 (Govt. Memo. Opposing Pretrial Release) at 3; Seiden Decl., Ex. 18.)  Defendant selected the specific firearms he wanted and paid approximately $1,500 in cash to Celaya to purchase two firearms on his behalf: (1) a Kahr Arms, .380 caliber pistol, bearing serial number CAA1387; and (2) a Zastava, model M70, semi-automatic rifle, bearing serial number Z70-144818.  (Plea Agreement ¶ 16; PSR ¶ 23; Celaya, Dkt. 12 at 3.)  Defendant then met up with Celaya near the store to collect the firearms.  (Seiden Decl., Ex. 9; Celaya, Dkt. 12 at 3.)[2]

When defendant's phone was later searched, the FBI recovered

---

    [2] Celaya pled guilty to making a material false statement during the purchase of a firearm in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2) and admitted in his factual basis that he acquired both of the firearms for Jaime Tran.  (Celaya, Dkt. 25 (Plea Agreement) at 7.)  His sentencing is set for September 23, 2024.

numerous messages from defendant inquiring about guns and ammunition for sale, including messages asking about obtaining ghost guns, postings on Craigslist looking to buy or trade firearms, and messages asking others to make firearm purchases for him in other states. (Seiden Decl., Ex. 9.)  Defendant conveyed to multiple individuals that he was unable to legally purchase firearms himself and offered to pay more if no background check was performed.  (Id.)

       2.   <u>Defendant Shot Victim 1 as He Left Religious Services</u>

Having made the necessary preparations, on the morning of February 15, 2023, in Los Angeles, California, defendant set in motion his long-contemplated plan to "kill all jews."  First, he used the internet to research locations with a "kosher market," believing that would lead him to Jewish people.  Defendant then drove to the Pico-Robertson neighborhood of Los Angeles, a neighborhood with a high concentration of Jewish residents, shops, temples, and synagogues, and drove around the neighborhood slowly.  Defendant saw his first victim ("Victim 1"), who was wearing a yarmulke and a prayer shawl.  Victim 1 identifies as Jewish and was leaving religious services at the time.  Victim 1 noticed defendant sitting in his car down the street and thought he was waiting for Victim 1's parking spot, but later realized the car was stalking him.  Defendant did not say anything to Victim 1.  (Plea Agreement ¶ 16; PSR ¶¶ 10-12, 38, 42.)

As Victim 1 opened the door to his own car, defendant fired two shots at Victim 1 at close range, trying to kill him.  One of the bullets struck Victim 1, causing an entrance wound on his right torso and an exit wound on his right lower back, just centimeters from his spine.  Defendant then fled the scene in his car.  Victim 1 was

treated for a gunshot wound and trauma to the lumbar spine.  (Plea Agreement ¶ 16; PSR ¶ 13.)

To this day, Victim 1 experiences ongoing pain in his back from being shot.  He thinks about being shot throughout the day, every day, experiencing a range of emotions from anger to sadness.  He does not have the same level of excitement about life as he did before he was shot.  Although he is grateful to be alive, Victim 1's anger has morphed into ambivalence because he feels he lives in a country where wrongdoers are not punished.  He has considered leaving the United States, where he does not feel welcome as a Jewish person.  (Seiden Decl., Ex. 12.)

### 3. The Following Day, Defendant Shot Victim 2 as He Left Religious Services

The following morning, February 16, 2023, defendant returned to the Pico-Robertson area of Los Angeles to continue his plan to hunt and kill Jews.  Defendant saw Victim 2, who also identifies as Jewish and was wearing a yarmulke, as Victim 2 was leaving religious services and walking to the home of a friend with whom he was staying.  As Victim 2 crossed the street, defendant stopped his car in front of Victim 2 and studied him.  As Victim 2 moved away, defendant fired three shots at Victim 2 at close range, hoping to kill him.  Because Victim 2 moved to the side as defendant shot at him, two of the bullets missed.  The third bullet struck Victim 2 in the arm.  Once again, defendant fled the scene.  (Plea Agreement ¶ 16; PSR ¶ 14.)

Victim 2 experiences ongoing trauma from being shot.  In his letter to the Court, Victim 2 describes the moment of the attack as he was leaving his synagogue.  (Seiden Decl., Ex. 13.)  He remembers

11

that he "sensed something suspicious" when he saw defendant staring at him in a hood and a mask and he "instinctively moved aside -- fortunately this reflect gesture saved my life!"  (Id.)  He has "reliv[ed] this scene over and over again" for several months after the attack, "traumatized by replaying every second, every movement of the approaching car, the person staring at me" while "I was wearing my yarmulke."  (Id.)  Even today, he experiences "visions or rather fears when I am on the street, crossing a street, or when a vehicle slows doing in front of or near me."  (Id.)  He is grateful that defendant was arrested and hopes defendant "won't harm anyone else for a very long time."  (Id.)

### C.   Defendant Was Arrested After Firing his Firearms in Public

Later on February 16, 2023, police responded to a report about a man who had fired a gun behind a motel and found defendant standing near his car with the driver's door open.  (PSR ¶ 17.)  Officers found a loaded Zastava Arms AK-47 rifle -- an illegal assault weapon under California law and the same firearm defendant had illegally acquired through a straw purchaser in Arizona -- laying on the driver's seat with the safety selector in the "fire" position.  (Id.; Seiden Decl., Ex. 14.)  Officers also found a loaded Kahr Arms semiautomatic handgun matching the second gun defendant illegally acquired in







Arizona on the front passenger seat and a shell casing matching the ammunition in the assault rifle on the ground nearby.  (PSR ¶ 17.) Defendant later told law enforcement that he had been practicing with his weapon at the time of his arrest.  (<u>Id.</u>)

### D.   Defendant's Digital Devices Revealed Further Evidence of His Hatred

Defendant's phone, seized upon his arrest, further revealed the extent of his obsession with killing Jewish victims.  Just three days before the shootings, he sent a message to a group of anonymous participants on Discord, stating: "it's time to kill all Jews."  His cell phone contained numerous other horrific threats against Jews:

- "I hope you burn in an oven and melt you fucking Jewbag Jewbagel Jew";
- "kill all Iranian Jews," "fucking Jew," "nuke Israel," "die Jew";
- "fucking kill yourself Jew," "fuck you Jew," "Jewbag," "Jewbagel," "piece of shit Jew";
- "slit your throat you autistic Jew," "die bitch Jew," "stupid gay bitch queer Jew";
- "fucking ruined the Earth you fucking Jew";
- "I want you dead, Jew," "someone is going to kill you, Jew";
- "hahaha your country is burning you fucking Jew," "fuck your whole country Jew";
- "cut your dick off and bleed to death you fucking Jew";
- "go die in a gas chamber you Jew";
- "should've been completely genocided in the Holocaust,"
- "fucking retarded faggot Jew,"
- "burn in hell you fucking Jew,"

- "I hate you like fucking crazy you fucking stupid pathetic loser subhuman trash ugly disgusting worthless senseless Jew";

- "die you fucking faggot queer gay loser piece of shit Iranian Jew.  Know one Likes you or your entire kind.  Go fucking kill yourself you worthless subhuman life form";

- "Quit talking about COVID-19 on your Twitter account you evil, ugly slutty, Jew," "Biggest bulshitting Jew ever," etc.

(Seiden Decl., Ex. 10.)

Defendant's phone also contained numerous messages in which he threatened various people that he would kill them or bully them and suggesting that they kill themselves.  The phone also contained hundreds of photographs depicting images of firearms, including attachments and ammunition, and antisemitic and racist pictures and rhetoric, including Hitler, Swastikas, and photos from the holocaust. (Id.)







The browser history on defendant's phone similarly revealed both his obsessive antisemitism and his efforts to commit targeted violence against Jews, including search phrases such as "Jews evil," "how to identify a Jew," and searches about Jews being responsible for COVID. The browser history also revealed defendant's searches for firearms dealers, straw purchases, firearm shipping to different states, and mass shootings and massacres. (Id.)

Defendant also had two laptops. Like that on defendant's phone, the browser history on the laptops revealed searches for handguns and ammunition, rifles for sale, terms like "Jewish hate," "Persian hate," "Persian Jew," and "I hate Persian guys," and research on various mass shootings, including the Sandy Hook shooting. The laptops also contained a saved document titled "weapon_9mmhandgun" and a downloaded copy of the book "Confessions of a Sociopath." (Seiden Decl., Ex. 11.)

## III. GUIDELINES AND PROBATION RECOMMENDATION

### A.   Sentencing Guidelines

The statutory maximum sentence for each of the four counts in the indictment is lifetime imprisonment, a five-year period of supervised release, and a fine of $250,000 or twice the gross gain or gross loss, whichever is greatest. There is no statutory mandatory

minimum for the hate crime counts.  However, there is a 10-year statutory mandatory minimum for each conviction for discharging a firearm during and in relation to a crime of violence.  Each of those terms must run consecutively to any other term of imprisonment. Thus, defendant's statutory mandatory minimum sentence is 20 years' imprisonment.

The parties have no agreement as to the Guidelines that are applicable in this case, although they have agreed that an appropriate disposition of this case is a sentence between 420- and 480-months' imprisonment followed by the maximum five-year term of supervision.  In July 2024, the United States Probation and Pretrial Services Office ("Probation") issued the PSR in which it calculated the Guidelines as follows, before factoring in the mandatory minimum sentences for discharging a firearm during crimes of violence:

| | | |
|---|---|---|
| Base Offense Level: | 33 | U.S.S.G. §§ 2H1.1(a)(1), 2A2.1(a)(1) |
| Extent of Bodily Injury: | +4 | U.S.S.G. § 2A2.1(b) |
| Hate Crime Motivation: | +3 | U.S.S.G. § 3A1.1(a) |
| Grouping: | +2 | U.S.S.G. § 3D1.4(a) |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1 |
| Total Offense Level: | 39 | |
| Guidelines (before § 924(c) counts): | CH I | 262-327 months |

(PSR at 4; see also PSR ¶¶ 33-71.)

The government agrees with these calculations.  The base offense level for each of the hate crime counts is 33 because in both instances, defendant engaged in an attempted premeditated killing. (U.S.S.G. §§ 2H1.1(a)(1), 2A2.1(a)(1); PSR ¶¶ 33-38, 50-52.) Specifically, defendant illegally acquired two firearms in the weeks leading up to the attempted murders.  (Id. at ¶ 23.)  Three days

16

before the attempted murders, he sent a message on Discord announcing it was "time to kill all jews." (Seiden Decl., Ex. 10.)  The morning of the first shooting, defendant used the internet to research locations with a "kosher market." (Plea Agreement ¶ 16; PSR ¶¶ 10, 38, 42.)  Defendant has admitted that he planned the shootings and that he shot with intent to kill. (Id.)

Under U.S.S.G. § 2A2.1(b), the offense level is increased by 4 levels because at least one victim sustained "permanent or life-threatening bodily injury." (PSR ¶¶ 40, 54.)  Under the Guidelines, "permanent or life-threatening bodily injury" means injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent. U.S.S.G. § 1B1.1, cmt. 1(K).  The Ninth Circuit has found that the circumstances of the crime can make injuries "life-threatening," particularly where the defendant put the victim in a "life-threatening situation" in which the victim may have died absent intervention. See United States v. Morgan, 238 F.3d 1180, 1188 (9th Cir. 2001) (holding district court erred by finding that "life-threatening" enhancement could not apply where "circumstances themselves are life-threatening, irrespective of any other injury that the victim may have suffered" and remanding for express determination of whether victim's maltreatment, which involved being locked in a car trunk in freezing weather for hours without fresh air, food, water, medical care, or heat, was life-threatening).[3]

---

[3] See also United States v. Butler, 20 Fed. Appx. 725, 728 (9th Cir. 2001) (affirming application of enhancement for "life-threatening" injuries where victim was shot and hit in the head, *(footnote cont'd on next page)*

Here, defendant fired at both victims multiple times at close range, striking Victim 1 in the back and Victim 2 in the arm, and then immediately fled, leaving them bleeding from gunshot wounds. (PSR ¶¶ 40, 54.)  Because defendant's conduct placed both victims in a "life-threatening situation," a four-level enhancement applies under U.S.S.G. § 2A2.1(b).

A three-level enhancement applies under U.S.S.G. § 3A1.1(a) because the evidence established, and defendant has admitted, that he intentionally selected his victims "because of" their actual or perceived race or religion.  (PSR ¶¶ 41-42, 55-56.)  In his plea agreement, defendant admitted that he shot Victim 1 because he "believed [Victim 1] to be Jewish and decided to shoot him because he was Jewish."  (Plea Agreement ¶ 16.)  He made a similar admission about Victim 2.  (Id.)

Although defendant has no criminal history points, the application of the hate-crime enhancement means that defendant is not entitled to any deduction for being a zero-point offender.  (PSR ¶ 69.)  He is, however, entitled to a three-point deduction for pleading guilty and timely accepting responsibility in this case. (Id. ¶¶ 67-68.)  After applying an additional two levels for the presence of multiple counts that do not group (id. ¶¶ 62-64),

---

causing blood loss and colon damage, left alone next to a canal bleeding profusely, and had to drag himself to safety, even though injuries were "later repaired," because "a victim's injury can be life-threatening if he or she is placed in a life-threatening situation, even if he or she does not suffer from life-threatening injuries"); United States v. Hinton, 31 F.3d 817, 826 (9th Cir. 1994) (evidence was sufficient to find defendant inflicted life-threatening injury to victim he stabbed in the hand, who was released from the hospital the same day, because defendant's "contemporaneous threat to kill [her]," "forceful blows," her "profuse blood loss," and his refusal to let her go to the hospital "endangered the victim's life").

18

defendant's total offense level is 39 and his Guidelines sentencing range is 262 to 327 months before consideration of the gun offenses.

Under U.S.S.G. § 2K2.4(b), the Guidelines sentence for a conviction under 18 U.S.C. § 924(c) is the minimum term of imprisonment required by statute, which is not affected by adjustments or departures under Chapter 3 (e.g., reductions for acceptance of responsibility).  Thus, defendant's Guidelines sentence for the firearm counts is 240 months, which runs consecutive to his sentence on the hate crime counts, for a total Guidelines sentence of 502-567 months' imprisonment, or 41.8-47.2 years.

**B.   Probation's Recommendation**

Defendant pled guilty pursuant to Rule 11(c)(1)(C), which requires the Court, after accepting the terms of the plea, to sentence defendant to between 35- and 40-years' imprisonment for his crimes.  Probation has recommended a sentence of 37.5 years, which is at the mid-point of this range.  (Letter at 1.)  While recognizing the heinousness of defendant's crimes, Probation pointed to defendant's long history of mental illness as mitigating in favor of a 37.5-year sentence.  (Id. at 4.)

**IV.  A 40-YEAR SENTENCE IS NECESSARY TO ACCOMPLISH THE PURPOSES OF 18 U.S.C. § 3553(A)**

Consistent with its obligations in the plea agreement, the government recommends a 40-year sentence in this case.  (Plea Agreement ¶ 18.)  A 40-year sentence appropriately balances the mitigating and aggravating factors regarding the nature and circumstances of the offenses, defendant's history and characteristics, the need for specific and general deterrence, and

1   the need to protect the public from defendant's future crimes.   18

2   U.S.C. § 3553(a).

3        **A.   The Nature and Circumstances of the Offenses**

4        The nature and circumstances of defendant's crimes warrant a 40-

5   year sentence.   Motivated exclusively by his perception of the

6   religious and racial identities of his victims, defendant attempted

7   to murder two strangers on consecutive days.   Far from acting on

8   impulse, defendant's conduct was cold-blooded and premeditated: after

9   spewing antisemitic hatred and threats for years, defendant decided

10   it was "time to kill all Jews," and then took several carefully

11   planned steps to carry out his murderous plan.   Defendant traveled to

12   another state to circumvent his firearm restrictions so that he could

13   purchase assault weapons, researched where to find a high

14   concentration of Jewish people, drove around the neighborhood looking

15   for victims, and then shot at Victim 1 multiple times at close range,

16   striking him and then fleeing, leaving Victim 1 bleeding in the

17   street.

18        Apparently unsatisfied with one attack, defendant returned to

19   the same neighborhood the next day to hunt for another victim.   Once

20   again, defendant identified a person wearing a yarmulke, shot him at

21   close range simply because defendant believed he was Jewish, and left

22   him for dead.

23        Though defendant shot his victims at close range with intent to

24   kill them, and though his bullets struck them just inches from their

25   spine and chest, both victims miraculously survived.   Had defendant

26   succeeded in his plan to murder his victims, he would be eligible for

27   the death penalty and his Guidelines range would be life.   18 U.S.C.

28   ¶ 924(j)(1); U.S.S.G. § 2A1.1 (First Degree Murder).   That is how

long his victims will live with the impact of his conduct.  As one

victim wrote in describing his prolonged trauma:

> In the days that followed, especially at night, I kept reliving
> the scene over and over again.  It lasted for several months –
> traumatized by replaying every second, every movement of the
> approaching car, the person staring at me, while the vehicle was
> about 2 meters away from me.  I was wearing my yarmulke, and I
> kept asking myself: Why did I move at that moment?  Why did I
> react like that?  These questions remained unanswered, except
> perhaps, certainly even, "there was an angel with me at that
> moment" . . .[e]ven today, I still have visions or rather fears
> when I am on the street, crossing a street, or when a vehicle
> slows down in front of or near me.

(Seiden Decl., Ex. 13.)

Had defendant not been caught the night of his second shooting,

his campaign of terror would likely have continued.  Defendant had

already made clear his desire to "kill all Jews," he had researched

mass shootings, and at the time of his arrest, in his own words, he

was "practicing" with an illegal assault weapon.

Thankfully, due to the swift action of law enforcement,

defendant was captured before he could commit additional attacks.

But defendant had already victimized more than the two people he

shot.  He committed the shootings on consecutive days in the same

predominantly Jewish neighborhood.  Both times he targeted victims

leaving religious services, and both times he disappeared immediately

afterwards.  For those two days, he terrorized an entire community,

with neighbors wondering when the gunman would return and whether

they too would be shot if they left their homes, simply because they

were Jewish.  Even after defendant was apprehended, members of the

community continued to feel the lasting impact of his horrific

crimes.  (See, e.g., https://beverlypress.com/2023/02/pico-robertson-

shootings-shock-community/, last accessed July 11, 2024 ("We can't

feel safe in our own neighborhoods.  That is terrifying, chilling to the bone.”))

**B.   Defendant's History and Characteristics**

Defendant obsessed over his antisemitic hatred for years.  What began as hateful speech as early as 2018 eventually escalated into threats to kill Jewish classmates, and, ultimately, to the attempted murders in this case.

Defendant posted antisemitic messages and images under the Instagram and Twitter handles "@k1llalljews."  He threatened his classmates via direct text messages, like those shown here. He distributed posters and sent emails blaming COVID on the "Jewish agenda." He emailed dozens of his former classmates excerpts from a website describing "Persian Jews" as "primitive," "narrow minded," and having "thick skulls."  Defendant's fixed, long-held, and obsessive hatred toward Jews led directly to the crimes in this case and demonstrates the ongoing danger he poses to the community.



Indeed, for nearly five years, defendant repeatedly rejected mental health treatment, despite describing himself as a "ticking time bomb."  When he was first treated in April 2018, he viewed himself as the victim of conspiracy theories promulgated by his Jewish classmates.  In 2018, after taking a leave of absence from

dental school, he was advised not to contact the other students, yet he continued to do so.  In August 2019, he was once again assessed to be a danger to himself and others, but he refused compliance with medication and continued to blame others for lying about him.  He declined to continue treatment at the end of 2019.  As recently as late 2022, defendant lashed out at his mother when she encouraged him to take his medication.

In addition to refusing to comply with mental health treatment, defendant has also refused to comply with the law.  Defendant was banned from possessing firearms for life in May 2018 and again in August 2019.  He repeatedly violated these bans.  In 2022, defendant was arrested on campus with a firearm he had deliberately obtained out-of-state, intending to "hurt some animals."  Later that year, he was arrested across the country for a hit and run.  And just months after that, defendant drove to Arizona to buy the guns he used in the shootings, again deliberately circumventing his firearm prohibition.  Coupled with his refusal to treat his mental health, defendant's refusal to comply with the law has had devastating consequences.

Given defendant's history of obsessive, antisemitic hatred, harassing and threatening Jews, refusing mental health treatment, and violating firearm prohibitions, defendant's total history and characteristics strongly weigh in favor of the government's recommended 40-year sentence.

### C.   The Need for Deterrence, to Protect the Public, and to Provide Just Punishment for the Offense

A 40-year sentence is necessary both to deter this specific defendant from ever committing such heinous crimes again and to make clear to others who share his views that hate crimes will not be

tolerated.  Antisemitism and hate crimes are on the rise.  According to the Anti-Defamation League ("ADL"), which has tracked such incidents over many decades, in 2023 there were 8,873 antisemitic incidents across the United States.[4]  That number represented a 140% increase over 2022 and was the highest number on record.  Incidents increased in all major categories, including assaults and harassment, and in all major location categories, including K-12 schools.  A significant sentence will deter not only this defendant, but also other would-be attackers from carrying out ideologically fueled violence.  A 40-year sentence will make clear that hate crimes will not be tolerated.

A 40-year sentence will also provide just punishment for the offenses, which terrorized a community and nearly took the lives of two innocent victims whom defendant targeted for no reason other than their religious faith.  These victims will forever have to live with the emotional and physical consequences of defendant's actions.

Finally, a 40-year sentence is necessary to protect the public. Defendant has demonstrated over several years his deep-seated hatred of Jews and his determination to kill.  While his mental health diagnoses may provide some context for his thought processes, they do not make him any less dangerous.  The Court should impose a 40-year sentence to prevent him from again terrorizing and victimizing the community.

---

[4] (See https://www.adl.org/resources/report/audit-antisemitic-incidents-2023, last accessed July 21, 2024.)

**V.    A FIVE-YEAR TERM OF SUPERVISED RELEASE IS WARRANTED**

The government agrees with Probation's recommendation that defendant be sentenced to the maximum possible term of supervised release, which is five years.

**VI.   THE GOVERNMENT REQUESTS THAT THE COURT SET A RESTITUTION HEARING**

As part of his plea agreement, defendant agreed to pay restitution to the victims of the offense.  Restitution is mandatory in this case.  (See 18 U.S.C. § 3663A; PSR ¶ 155.)  At present, the government is still ascertaining the amount of restitution owed to the victims of defendant's crimes and, therefore, respectfully requests that a restitution hearing be set for 90 days following sentencing.  18 U.S.C. § 3664(d)(5).

**VII. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 40 years' imprisonment, to be followed by five years of supervised release, including the special conditions agreed to by the parties, and that it set a restitution hearing for 90 days following sentencing.